UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

**TIMOTHY S. KINGMAN,**
4079 N. Bay Road
Rhinelander, WI  54501,

       Plaintiff,

vs.

Case No.  19-CV-999

**MAYOR CHRIS FREDERICKSON,**
**COUNCIL PERSON ANDREW LARSON,**
**COUNCIL PERSON DAVID HOLT,**
**COUNCIL PERSON STEVE SAUER,**
**COUNCIL PERSON RYAN ROSSING, and**
**CITY ADMINISTRATOR DANIEL GUILD,**
individually and in their official capacity,
135 S. Stevens Street
Rhinelander, WI  54501,

**CITY OF RHINELANDER,**
135 S. Stevens Street
Rhinelander, WI  54501,

       Defendants.

---

## COMPLAINT

---

The plaintiff, Timothy Kingman, by his attorney, William R. Rettko, hereby alleges and shows to the court as follows:

<u>NATURE OF THE ACTION</u>

This action is brought to secure the plaintiff's First Amendment right to freedom of speech without incurring a penalty in violation of 42 U.S.C. § 1983, and to secure plaintiff's right to oppose any action made unlawful by 29 U.S.C. §623(d).

JURISDICTION AND VENUE

1.   Jurisdiction of this court is invoked pursuant to 28 U.S.C. §§ 1331, 1343, and 2201, and the Equal Employment Opportunity Commission's Notices of Right to Sue Within 90 Days; a copy of which are attached hereto as Exhibits A.

PARTIES

2.   The plaintiff, Timothy Kingman ("Kingman"), was employed by the City of Rhinelander and was assigned as its Director of Public Works at all pertinent times hereto.

3.   The defendant, Mayor Chris Frederickson ("Mayor"), at all times relevant to this action, was and is the City of Rhinelander Mayor and is a party in both his individual and official capacity.

4.   The defendant, Council Person Andrew Larson ("Larson"), at all times relevant to this action, was and is an elected Council Person for the City of Rhinelander and is a party in both his individual and official capacity.

5.   The defendant, Council Person David Holt ("Holt"), at all times relevant to this action, was and is an elected Council Person for the City of Rhinelander and is a party in both his individual and official capacity.

6.   The defendant, Council Person Steve Sauer ("Sauer"), at all times relevant to this action, was and is an elected Council Person for the City of Rhinelander and is a party in both his individual and official capacity.

7.   The defendant, Council Person Ryan Rossing ("Rossing"), at all times relevant to this action, was and is an elected Council Person for the City of Rhinelander and is a party in both his individual and official capacity.

2

8. The defendant, City Administrator Daniel Guild ("City Administrator Guild"), at all times relevant to this action, was and is employed by the City of Rhinelander and assigned as its City Administrator and is a party in his individual and official capacity.

9. The defendant, City of Rhinelander ("City"), is a municipal corporation with its principal offices located at 135 S. Stevens Street, Rhinelander, Wisconsin, and is and was at all material times hereto, a municipal employer including the employer of Kingman.

STATEMENT OF CLAIMS

10. On April 17, 2018 the City election occurred whereby Newly elected Mayor Frederickson and newly elected Council Persons Holt, Larson and Rossing joined with Council Person Sauer to form a new majority, and eight days later, interim City Administrator Keith Kost resigned.

11. On September 17, 2018, the City hired Daniel Guild as is new City Administrator and he suggested and it was implemented from that point going forward that the City move from a committee structure of government to a "council of the whole" form of government whereby the City would be run solely by the decisions of the majority of Council Persons and the Mayor.

12. During the Fall of 2018, City Administrator Guild was responsible for submitting an annual work plan to the City Council and Mayor and needed information on the City's Department of Public Works from Kingman to do this annual plan, but often cancelled meetings he scheduled with Kingman.

13. By December 7, 2018, City Administrator Guild accused a few Council members of releasing closed session and attorney client privileged information.

14. On January 28, 2019, City Council President George Kirby attempted to speak at a Common Council member as a "taxpayer" to draw attention to the $13,000 in City funds paid by City Administrator Guild to buy office equipment, but was refused to speak on the matter as it was not an item on the Council's agenda that evening which caused Council President Kirby to leave the Council meeting temporarily leaving the Council without a quorum to complete the agenda.

15. Upon information and belief, on or about January 30, 2019, the Mayor together with Council Persons Larson, Holt, Sauer and Rossing conducted a series of personal communications, emails and communications with each other in private and without prior public notice wherein with the assistance of City Administrator Guild who had drafted a letter which they all agreed to sign off on and send to Council President George Kirby suggesting he resign given recent events, and promising a forthcoming conversation that may be uncomfortable.

16. On January 31, 2019, City Administrator Guild sent an email on behalf of the Mayor and the "majority" of the Council Persons requesting information from the League of Wisconsin Municipalities as to how the Common Council could remove Council President George Kirby from being Council President after Kirby complained about Guild's expenditure on office furniture for the City Administrator's office, but was prevented from raising it at the Council meeting on the 28th.

17. By the February Council meeting City Administrator Guild submitted an Annual Work Plan for Council approval and in doing so noted that he had:

interactions with drunk Council members, dishonest Council members, Council members who intentionally disrupted planned strategy and work product efforts, Council members releasing closed session and attorney-client privileged information, and Council members who bully, harass, defame, and outright lie publicly in both traditional and online social

media. I have also personally witnessed employees engaging in certain workplace behaviors, not because they were instructed by their supervisor to do so, nor because the action was rooted in any best practice, or experience, or even good-faith judgment, but purely out of fear to hopefully avoid further upsetting an unpredictable or emotional elected official or department director….

18. On February 21, 2019, City Attorney Miljevich was notified by certain individuals that City Administrator Guild had asked the IT Consultant he had hired to check the City's Information system for viruses to change the server giving the City Administrator full access to review others' emails and to delete documents which caused the City Attorney to call Council Person Dawn Rog who then met with and instructed the IT Consultant to stop whatever she was doing, and this resulted in an accusation by the IT consultant that Ms. Rog screamed at her and pushed her which then became an assault investigation with the Rhinelander Police Department.

19. Following the incident between Rog and the IT Consultant, but on that same day, City Administrator Guild had an unannounced meeting with City Staff that was also attended by the Mayor and City's Police Chief wherein Guild informed staff that they were not to follow instructions of any one Council member nor of the City Attorney as she had clearly picked sides and was not acting on behalf of her client which was the "majority" of the Council, and they were to all act only upon written instruction provided by the "majority" of the common council.

20. On February 22, 2019, Kingman met with City Administrator Guild and the Mayor after learning of the City Administrator's meeting and instructions to City Staff, and informed them that meeting was highly disruptive, inappropriate and concerning as staff viewed this speech as harassment, intimidation, and workplace retaliation to which the City Administrator and Mayor informed Kingman his concerns had no merit to which Kingman indicated that if they did not take corrective action he would take further action to get this corrected.

21. On March 4, 2019, after receiving no hint of any corrective action to the harassment, intimidation and workplace retaliation, Kingman then met with the City's Finance Director to provide her a draft of notes for a Statement of No Confidence on the City Administrator as she had two out of the five staff employees the City Administrator met with on February 21st and although she felt Kingman's statement was accurate and reflected the harassment, intimidation and workplace retaliation staff was facing, she indicated she would not sign the document as she had worries for job security if she did so.

22. On March 6, 2019, Kingman then met with and showed the City's Utility Clerk and Administrative Assistant his Statement of No Confidence on the City Administrator and they agreed the statement properly reflected the workplace environment that was objectionable to staff, and they agreed to sign the Statement.

23. On March 8, 2019, the City Clerk and Assistant City Clerk notified Kingman that they had heard of his Statement of No Confidence on City Administrator Guild and told Kingman they wanted to sign the document and provide input into the City Administrator's 6-month review that was coming up.

24. On March 11, 2019, after signing the Statement of No Confidence and getting signatures from the Utility Clerk, Administrative Assistant, City Clerk and Assistant City Clerk, Kingman presented the document to the Common Council during public forum as a citizen speaking on his own time identifying that City Administrator Guild had created of a hostile work environment explaining that intimidation and fear of retribution existed and controlled the workplace.

25. On March 21, 2019, Kingman emailed the Mayor in follow up to his public comment on City Administrator Guild's creation of a hostile work environment to indicate that

6

he together with the others who signed off on the Statement of No Confidence were concerned that their complaints as set forth in the Statement were not on the City Council Agenda set for March 25th and they were becoming concerned that such inaction in failing to even address the issues raised would result in retaliation including the loss of their jobs.

26. On March 28, 2019 at 4:54 p.m., Kingman received an email from Attorney James Macy ("Macy") that he and Mr. Rick Hermus ("Hermus") were engaged by the City of Rhinelander to investigate the complaints made in the Statement of No Confidence and they wanted to meet with him at 1:15 p.m. the next day March 29, 2019 to discuss this at a conference room in the police department.

27. On March 29, 2019, Kingman emailed the Mayor and indicated he would not attend the Macy/Hermus meeting without written direction from the Mayor as it was now apparent the matter was going to be handled in secret instead of in open session before the common council and that City Administrator Guild had not had any discussion with any person signing the Statement of No Confidence since it was presented, and all involved were in fear of losing their employment through retaliation.

28. On April 2, 2019, the City Administrator cancelled the Department Head meeting without further rescheduling.

29. After the cancelling of the Department Head Meeting, Kingman emailed the Mayor that same day to reiterate it had been over 30 days since the City Administrator had met with him on any City matter, there still had not been any action to resolve the issues raised in the Statement of No Confidence, that the one employee who did attend the Macy/Hermus interview on March 29th was not questioned, but was rather informed the City Administrator had it within his abilities to take the actions complained of and that the matter was not taped

7

which Kingman noted gave every appearance of being anything but transparent, but rather to back the City Administrator's hostile acts by the Mayor and supporting Council members while also noting that this same outside attorney had assembled the agenda for the April 2, 2019 Council meeting in which the current City Attorney's position was to be discussed.

30. On April 2, 2019, the Mayor together with Council Persons Larson, Holt, Sauer and Rossing voted to dismiss City Attorney Miljevich without cause limiting her to a final 60 days of employment with the City.

31. On April 3, 2019, Kingman emailed the Mayor and City Administrator Guild that he had been contacted by news agencies requesting comment on the decision to terminate the City Attorney's services and he simply stated he felt it was unjust and had been conducted without his input and he too was in fear of losing his job.

32. On April 4, 2019, City Administrator Guild contacted Kingman to tell him that if there was a conversation with local news media "they" felt Kingman was to be a part of in his role as Public Works Director, they expected his discussion would be for the benefit of the City, and if he wanted further guidance when making a "factual" statement to the media they would be happy to meet with him, and discuss that dialog to which Kingman indicated he would like to have such a meeting to gain guidance on factual statements.

33. On April 4, 2019, Kingman filed an Age Discrimination and Retaliation complaint regarding harassment and retaliation he and the female staff had been incurring with the City and forwarded the same to the State of Wisconsin Equal Rights Division on April 5, 2019.

34. Also, on April 4, 2019, Kingman as Director of Public Works received notice of an incident occurring in the lunchroom wherein numerous employees where involved in yelling insults at each other, and as such, sent forms to those involved to document their

8

observations of events and requested they be submitted to the Street Foreman as this matter was going to be addressed.

35. On April 8, 2019, Kingman notified the Mayor that due to the City's inactions on the Statement of No Confidence and his March 29, 2019 retaliation claim, except for the Macy/Hermus interview of another employee that was viewed as one-sided, he had filed a claim with the City and the State Equal Rights Division as the workplace stress issues he raised had not been addressed.

36. On April 17, 2019, Kingman notified City Administrator Guild among others that one of the DPW workers involved in the April 4, 2019 lunchroom disruption incident was refusing to complete the required documentation or to speak to Kingman about the incident and would only speak to the City Administrator. As such, Kingman suggested that with the City Administrator's approval, Kingman would issue a written/verbal warning and close the matter as the other three employees involved had been interviewed and received verbal warnings.

37. On April 22, 2019, seven employees of the DPW together with a former DPW employee attended the common council meeting and expressed they had been subject to conditions of harassment and retaliation in the workplace and had been for years and they feared for their jobs.

38. On April 23, 2019, Kingman notified the Mayor that four of the employees speaking on April 22, 2019 had filed a complaint with the City in the past and all four matters were addressed timely with simple clarifications and or work adjustments used to resolve them, however, there were no pending complaints and would instruct their foreman to issue verbal warnings to follow City policy by providing complaints before making comment.

9

39. On April 25, 2019, the Foreman notified Kingman he was not going to issue verbal warnings to the 7 employees who spoke out at City Hall as they were not on City time when they spoke at the common council meeting to which Kingman responded that he would seek appropriate legal guidance before taking action although the workplace rules required the reporting of intimidation, harassment and/or retaliation before raising the issues outside of the workplace.

40. On April 25, 2019, Kingman then emailed the Mayor and City Administrator asking for legal direction on what action if any should be taken on the events of April 22, 2019.

41. On April 29, 2019, Kingman emailed the Mayor and others presenting a series of twenty questions regarding City Administrator Guild's Facebook posts in which Guild made special notice supporting the seven DPW workers who spoke out at the April 22, 2019 Common Council meeting claiming Harassment within the DPW by thanking them for their courage, candor and commitment to the City and expressing their desire to have the workplace culture improved, causing Kingman to ask why there hadn't been a response to the Statement of No Confidence as of yet as the five persons signing off on that statement had already dwindled to four.

42. Later on, April 29, 2019, City Administrator Guild sent Kingman and others an email on behalf of the Mayor to inform them that they were scheduled to be interviewed by Macy/Hermus at the Rhinelander Police Department on May 1, 2019.

43. On April 30, 2019, the Mayor cancelled the Common Council meeting set for that evening due to the fact there would not be a quorum of Council members able to attend in which Kingman later emailed the Mayor, City Attorney Miljevich and others indicating he would not be attending the Macy/Hermus interview on May 1st on the basis one City

Administrator had left his position since the Mayor was elected, one Council Person left office in the fall of 2018 after the City Administrator took over, there was an attempt to dismiss the Council President from his position as President, the City Attorney had been terminated on April 2, 2019, a Council member had been accused of assault for questioning an IT Consultant hired by the City Administrator and one of the five persons who had signed off on the Statement of No Confidence was quitting due to frustration from continued harassment.  In addition, Kingman noted there had been no effort to investigate the complaints in the Statement of No Confidence, the Macy/Hermus team did not seem to be impartial as the Council meeting set for that evening was for the City to enter into a contract with the Macy/Hermus team even though Macy/Hermus had already met with the City Administrator and the City Administrator's six month evaluation that should have occurred around April 17, 2019 had not yet taken place nor had it been set to take place, all of which gave the appearance of an impartial investigation being conducted.

44.  On May 1, 2019, City Attorney Miljevich who was to be City Attorney through May 31, 2019, responded to Kingman and others indicating Kingman was right not to attend the meeting with Macy/Hermus on May 1st as Macy/Hermus had not been contracted by the City to investigate Human Resource matters up to that point.  In addition, Attorney Miljevich provided a letter from the League of Wisconsin Municipalities on this same issue in which the opinion rendered by the League was that the City may not have two City Attorneys at the same time unless it was for a specialized service, and that the Mayor had no authority to make such a hire as such a hire had to be by Common Council vote on a specific contract detailing the specialized service which had not been done up to that point.

11

45. Upon information and belief, on May 1, 2019, the Macy/Hermus interviews took place on eleven DPW workers with City Administrator Guild being present during the interviews.

46. On May 3, 2019, after learning of the City Administrator response to an Open Records request made on May 2nd that demanded the release of Kingman's correspondence relating to complaints made by DPW employees at the Common Council Meeting of April 22nd, Kingman wrote an email to the Mayor and others that the production of documents within a day of receipt without first being coordinated by the City Clerk and screened by the City Attorney together with the investigation and interviews held on May 1st gave every appearance of being biased toward a predetermined outcome as it became apparent on May 1st City Administrator Guild was no longer a party to be interviewed, the City Attorney was disregarded from the interviews, persons not initially noticed to attend interviews were solicited for interview without explanation, and Macy/Hermus who were conducting the interviews were hired by the Mayor without first getting Common Council approval.

47. On May 13, 2019 at a Common Council Meeting, one of the items listed to be covered in closed session was the 6 month performance review for City Administrator Guild (a review originally set in March), but the review did not take place as Council Persons Larson, Holt, Sauer, Rossing and the Mayor voted to keep the May 13th meeting in open session.

48. On May 23, 2019, City Administrator Guild telephoned Kingman to request his presence at a meeting with him, and upon getting to Guild's office, Kingman discovered Macy and Hermus were waiting to interview him which caused Kingman to call the Mayor and demand that the Mayor order him to participate, but before the Mayor did so, Macy stated that

12

was enough as he was authorized to perform this interview and the Kingman interview was then conducted.

49. On May 29, 2019, the Common Council meeting set for that evening was cancelled, and it was at this meeting that the Macy/Hermus contract was to be approved by the Council.

50. On June 3, 2019, Kingman was directed to City Administrator Guild's office where he met with Guild and the Mayor at which time he was provided notice that he was being placed on Administrative Leave and was no longer allowed to be on City property or allowed to communicate with any employee of the City unless authorized by the Mayor or City Administrator Guild to do so.

51. On June 24, 2019 the City's Common Council met with Kingman in closed session whereby he objected to the allegations and provided a summary of his thoughts and involvement in and actions related to the seven DPW employees who alleged Kingman had created a hostile work environment within the DPW.

52. On June 25, 2019, Kingman was terminated by vote of the "majority" that included Council Persons Larson, Holt, Sauer, Rossing and the Mayor.

53. On or about July 1, 2019, Kingman provided an Employment Information Authorization and Waiver of Privilege form to the City of Rhinelander Human Resources Department so that his entire personnel file from the City would be provided to his attorney, and Guild responded to this request on July 24, 2019 with what the City then had in Kingman's personnel file which amounted to a total of 19 pages.

54. On or about August 1, 2019, Guild indicated that the documents sent to Kingman's attorney was really an inadvertent response to Jamie Taylor's July 23, 2019 request

(Northwoods River News Reporter), and it was discovered that Kingman's personnel file had been inappropriately removed from the City files.

55. Starting in August 2019, Mr. Kingman began new employment with the City of Horicon, Wisconsin as its Public Works Director.

56. On August 20, 2019, the City sent Kingman's attorney all responsive documents they could locate on Kingman's personnel file which again amounted to the 19 documents previously provided on July 24th, and there was no document detailing any investigation into prior complaints made over the last several years by DPW workers against Kingman which were determined to be without basis.

57. Upon Information and belief, on September 24, 2019, City Administrator Guild learned of the EEOC's providing Kingman with the Notice of Right to Sue, and by September 27, 2019 posted on his Facebook page that Kingman while being the Public Works Director for Rhinelander made it an official practice that all gates, buildings and doors at the City's wastewater treatment plant were left unlocked every night and city ratepayers should stay tuned as more developments would be disclosed in the coming weeks.

58. On October 30, 2019, Detectives with the Rhinelander Police Department traveled to the City of Horicon Police Department at a time Kingman was set to meet with the Horicon Police Chief for City of Horicon business and directed Kingman go to a separate room where they interrogated Kingman on allegations of allowing a preferred private business gaining access to Rhinelander Public Works facilities after hours and not billing them for every service provided by Rhinelander.

14

59. During the October 30, 2019 interrogation, the Rhinelander Detectives made it clear that even though Kingman denied all such allegations they were convinced he had done the things alleged and were going to persuade that he be criminally charged.

<u>FIRST CAUSE OF ACTION</u>
<u>FOR VIOLATION OF FIRST AMENDMENT RIGHT</u>
<u>TO FREEDOM OF SPEECH UNDER COLOR OF STATE LAW</u>

60. Reallege and incorporate herein by reference paragraphs 1 through 59 of this Complaint as if set forth at length herein.

61. As a direct result and proximate cause of Kingman's engaging in speech on matters of public concern by drafting a Statement of No Confidence and speaking about it at as a citizen during a City Common Council Meeting in which he raised issues of public concern on harassment, intimidation, the stifling of speech, and fear of retribution from City Administrator together with demanding a Notice of Right to Sue from the EEOC all of which are protected under the First Amendment of the United States Constitution, he was wrongfully retaliated against, ultimately wrongfully terminated, and forced to continually fight ongoing false allegations of criminal activity.

62. The City has in the past and continues to engage in a practice of retaliatory isolationism, discipline, and discharge of its employees and council members who do not always agree with the "majority" rule as a way to prohibit speech protected by the First Amendment of the United States Constitution and has retaliated against employees and Council members for exercising their First Amendment free speech rights including, but not limited to, Kingman, Council Persons Bellevue, Rog, Kirby, former City Administrator Keith Kost, Stephanie Racjak and City Attorney Miljevich.

63. The termination of Kingman was made in retaliation for his exercise of his First Amendment right of free speech which by drafting, executing, and getting others to sign off on the Statement of No Confidence on City Administrator Guild who had created a hostile, intimidating and retribution filled work environment for staff, and for then publicly announcing the Statement of No Confidence at the Common Council Meeting of March 11, 2019.

64. Kingman engaged in protected speech by speaking on workplace harassment, intimidation and retribution all of which is a matter of public concern which was a substantial and motivating factor in the defendants' decision and subsequent actions to terminate Kingman, to inappropriately remove exonerating documents from Kingman's personnel file regarding prior complaints made by DPW workers that turned out to have no basis, to make up a bogus complaint about Kingman's department also being hostile, with fear of retribution and to terminate him for allegedly demanding supervisors under him to terminate the seven employees who spoke out at the April 22, 2019 Common Council meeting, and to continue with allegations of criminal activity. Had Kingman not engaged in this form of protected speech, he would not have been terminated or forced to defend against false allegations of criminal activity by the defendants.

COMPENSATORY DAMAGES

65. Reallege and incorporate herein by reference paragraphs 1 through 64 as if set forth herein at length.

66. As a direct result and proximate cause of the combined conduct of the defendants, Kingman has been deprived of his First Amendment rights of free speech as granted by the Constitution of the United States of America.

16

67. The defendants were not acting within the scope of qualified immunity because their conduct violated the clearly established constitutional rights Kingman not to be terminated or forced to defend against false allegations of criminal activity in retaliation for the exercise of his First Amendment right of free speech.

68. The defendants' combined actions and subsequent retaliatory termination has caused Kingman monetary damages, damage to his reputation, prevented his right to pursue mutual economic goals, mental anguish, attorney fees and other expenses.

## PUNITIVE DAMAGES

69. Reallege and incorporate herein by reference paragraphs 1 through 68 as if set forth at length herein.

70. Defendants Mayor Chris Frederickson, Council Persons Larson, Holt, Sauer and Rossing, together with City Administrator Guild have and continue to act in a pattern to squelch and intimidate employees and Council Persons in their First Amendment right to free speech, and have done so intentionally in malicious disregard to the First Amendment as well-established law has put them on notice such activity is unlawful.

71. The defendants' continued actions and patterns to squelch employees and Council Persons of their First Amendment right to free speech after being placed on notice of these unlawful actions by well-established law is a willful, wanton, and an intentional disregard of Kingman's constitutional rights making punitive damages against the defendants in their individual capacity appropriate and necessary to stop these repeated patterns from reoccurring.

## SECOND CAUSE OF ACTION
## RETALIATION FOR SUPPORTING AND MAKING CLAIMS
## OF DISCRIMINATION PROHIBITED BY 29 U.S.C. § 623(d)

17

72. Reallege and incorporate herein by reference paragraphs 1 through 71 as if set forth at length herein.

73. Kingman engaged in filing a complaint to the Equal Rights Division claiming age discrimination and retaliation.

74. As a direct result of Kingman's age discrimination claim with the Equal Rights Division, the City took steps to create a complaint and investigate Kingman for creating a hostile work environment within the Department of Public Works and for allegedly seeking termination of the seven employees who spoke out at the April 22, 2019 Common Council meeting claiming Kingman had created a hostile work environment for them ignoring Kingman had taken steps to enforce well-established work rules when numerous employees yelled insults at each other in the workplace lunchroom.

75. As a direct result of the investigation into Kingman's enforcement of workplace rules, the "majority" of the Common Council and Mayor determined Kingman had created a hostile work environment by allegedly ordering supervisors to terminate employees who spoke out at the April 22, 2019 Common Council meeting regarding that hostile work environment and terminated Kingman from his position as Director of the Public Works Department.

76. Had Kingman never engaged in making his age discrimination claim with the Equal Rights Division, the City would not have terminated Kingman as he was enforcing workplace rules against employees for yelling insults at each other in the workplace lunchroom.

77. As an additional direct result of Kingman having filed a claim of age discrimination and retaliation for making such claim and demanding a Notice of Right to Sue, the defendants would not have made false allegations of criminal activity by Kingman.

78. Had Kingman never demanded a Notice of Right to Sue from the EEOC, the defendants would not have made false allegations of criminal activity by Kingman.

79. The City's combined actions and subsequent retaliatory termination has caused Kingman monetary damages, damage to his reputation, prevented his right to pursue mutual economic goals, mental anguish, attorney fees and other expenses.

80. The City's actions are a willful, wanton, and intentional disregard Kingman's constitutional rights making punitive damages against the City appropriate and necessary to stop these repeated patterns from reoccurring.

WHEREFORE, Timothy Kingman respectfully prays that this court:

A.      Assume jurisdiction over this case;

B.      Declare that the defendants' retaliatory termination of Kingman violated his free speech rights under the First Amendment to the United States Constitution and enter a declaratory judgment to that effect;

C.      Award all loss of wages and benefits as a result of the termination;

D.      Award compensatory damages against the defendants jointly and severally to be determined by a trier of fact;

E.      Award punitive damages against the defendants jointly and severally to be determined by a trier of fact;

F.      Declare that the City retaliated in terminating Kingman in violation of 29 U.S.C. § 623(d), and award all loss of wages and benefits together with compensatory damages and punitive damages to be determined by a trier of fact;

G.      Grant the plaintiff his costs, disbursements, and attorney fees in bringing this action; and

H.      Grant such further relief as the court deems just and necessary.

JURY TRIAL DEMANDED

The plaintiff hereby demands a jury trial on all issues so triable.

Respectfully submitted this 9th day of December, 2019.

> s/William R. Rettko
> State Bar No. 1002608
> Counsel for Plaintiff
> RETTKO LAW OFFICES, S.C.
> 15460 W. Capitol Drive, Suite 150
> Brookfield, WI  53005
> Telephone: (262) 783-7200
> Facsimile: (262) 783-7202