IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

TIMOTHY KINGMAN,

                Plaintiff,                OPINION AND ORDER

v.

                                              19-cv-999-wmc

CHRIS FREDERICKSON, ANDREW
LARSON, DAVID HOLT, STEVE
SAUER, RYAN ROSSING, DANIEL
GUILD and CITY OF RHINELANDER

                Defendants.

Defendants have moved for summary judgment (dkt. #51), arguing that no genuine dispute of material fact exists that might save plaintiff Timothy Kingman's claims for violations of the Age Discrimination in Employment Act, 29 U.S.C. § 621, *et. seq.* ("ADEA"), and wrongful retaliation under the First Amendment. For reasons explained more fully below, the court agrees that plaintiff has been unable to offer sufficient evidence from which a reasonable jury could find in his favor. Accordingly, the court must grant summary judgment in the defendants' favor.

UNDISPUTED FACTS[1]

**A. Kingman's Employment By City of Rhinelander**

In May of 2011, the City of Rhinelander hired Timothy Kingman as the Director of the Department of Public Works, reporting directly to the City Administrator. ((Pl.'s

---

[1] As cited, the following undisputed facts are derived from the record in this case, viewing all of the evidence in a light most favorable to plaintiff as the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

Resp. to Def.'s PFOF (dkt. #70) ¶¶ 1, 8, 10.)  While an "at-will employee," Kingman could only be terminated by a majority vote of the entire City Council.  (*Id*. ¶ 9.)  In fact, part of Kingman's duties in this position required his attendance at city council meetings to recommend actions on public works matters.  (*Id*. ¶¶ 13, 17, 18.)  Although he had no past experience supervising others, Kingman also had authority over the approximately twenty-five employees of Department of Public Works ("DPW"), including the authority to discipline.  (*Id*. ¶¶ 23-25.)

In 2015, two DPW employees complained that Kingman was demeaning and disrespectful.  (*Id*. ¶ 26.)  Concerns over these complaints led the City Administrator at the time, Kristina Aschenbrenner, to discuss them with the Mayor, remove Kingman from overseeing the complaining workers, and put him on a Performance Improvement Plan as of January 2016.  (Pl.'s Resp. to Def.'s PFOF (dkt. #70) ¶ 27, 29-31.)  Although Kingman felt Aschenbrenner needed council consent to put him on such a plan, she also gave him a verbal warning in April 2016 for "unauthorized disclosure of confidential information, ongoing absenteeism and tardiness, and continued incivility and rudeness toward subordinates," which Kingman disputes as meritless.[2]  (*Id*. ¶ 34.)   The warning also

---

[2] Kingman's counsel, William Rettko, also represents Interim City Administrator Keith Kost found that both the employee complaints and Aschenbrenner's warning lacked merit, citing to Kost's deposition. (Rettko Aff. (dkt. #65-12).)  However, this representation appears to mischaracterize much of Kost's cited deposition testimony.  For instance, plaintiff Kingman's written response to the fact of Aschenbrenner's warning was: "This was a verbal warning which Interim City Administrator Kost reviewed together with other discipline issued by Ms. Aschenbrenner on Kingman in [which] he determined DPW employees made complaints because they did not like what a supervisor was telling them to do, would stage events, and bypass internal complaint processes." (Pl.'s Resp. to Def.'s PFOF (dkt. #70) ¶ 34.)  However, the *closest* Kost's deposition testimony gets to that is a general statement, "If somebody got mad at a boss or a coworker, instead of going up the chain of command, they'd pick up the phone and call a city council member." (Rettko Aff. (dkt. #65-12) 32.)  That testimony obviously says *nothing* about Kost's view of the

references Kingman telling Aschenbrenner, "I am sick of this shit with you" during a meeting between the two, although Kingman's counsel maintains this was Aschenbrenner's comment without evidence in support. (*Id*. ¶ 35.)

In August 2016, yet another employee complaint was made against Kingman, with the employee noting 13 different instances of harassment from Kingman dating back to 2014. (*Id*. ¶¶ 40-41.) The complaint included allegations that Kingman called employees his "bitches," yelled at workers, and often referred to them as "retards." (Frederickson Decl. (dkt. #54-6) 3-8.) Another employee submitted a similar complaint against Kingman in January of 2017, asserting that Kingman was belittling and told the employee that he was stupid. (Pl.'s Resp. to Def.'s PFOF (dkt. #70) ¶¶ 48-49.)

While then-Interim City Administrator Kost did not find a need for any further adverse action on this additional complaint was necessary at that time, it was added to Kingman's personnel file. (Rettko Aff. (dkt. #65-12) 18.) At least three more employees eventually submitted complaints about Kingman's leadership "style" before 2018, although Kingman again disputes any merit in those underlying complaints as well. (Pl.'s Resp. to Def.'s PFOF (dkt. #70) ¶¶ 53-57.) Even so, Kingman concedes that he has been the subject of numerous personnel complaints, had received warnings from his supervisors, and was on a Performance Improvement Plan *even before* the specific events giving rise to his claims in this case. (Pl.'s Resp. to Def.'s PFOF (dkt. #70) ¶¶ 29-30, 41-45, 48.)

---

merits of particular complaints made against Kingman or his verbal warning, much less that either "lack merit" as plaintiff's counsel represents. This is one of many mischaracterizations of evidence. Although the court will not address each individually, it should not need to be said that counsel's mischaracterization of evidence fell far below his ethical duty and professional obligations to this court.

### B. Declaration of "No Confidence" in the New City Administrator

In April 2018, defendant Chris Frederickson was elected as the city's new, part-time mayor. (Pl.'s Resp. to Def.'s PFOF (dkt. #70) ¶¶ 53-57.) Defendants Andrew Larson, David Holt, and Ryan Rossing were also newly elected as members of the eight-person City Council at that time, on which defendant Steve Sauer was already serving. (Id. at ¶¶ 61-62.) In September 2018, the new city council voted to hire defendant Daniel Guild as the new City Administrator. (*Id*. ¶ 65.) Once hired, Guild reported to the Mayor and the Council, while Kingman reported to Guild. (*Id*. ¶¶ 70-71.)

As the new City Administrator, Guild created a comprehensive, written annual work plan following his personal interviews of all or nearly all of the city's some 110 employees. (*Id*. ¶ 73.) In the plan, Guild was particularly critical of a "negative workplace and morale issues unlike any he had ever seen in his experience working for municipalities." (*Id*. ¶ 74.) He was also extremely critical of the conduct of City Council members, including drunkenness, intentional disruption of planning meetings and strategy, breaches of confidentiality and bullying. (*Id*.)

After the annual work plan issued on March 6, 2019, Kingman questioned Guild about the appropriateness of such "unqualified observations in an annual work plan," and on March 11, 2019, Kingman personally presented a "Declaration of No Confidence in Daniel Guild" ("the Declaration") to the mayor and council at a city council meeting, which was signed by Kingman and four other staff members and detailed a variety of complaints about Guild's performance. (*Id*. ¶¶ 76-77, 79-81.) Kingman also provided his written, supporting remarks, which were attached to the Declaration. (*Id*.) The night

4

Kingman presented the Declaration, the council was conducting Guild's six-month performance review, and Kingman asked that his Declaration be considered for the review. (Pl.'s Resp. to Def.'s PFOF (dkt. #70) ¶¶ 86-87.)  Among other things, the Declaration noted that Guild "failed to consult with select Department Heads," "is rarely in his office . . . [and] often doesn't respond to emails." (Frederickson Decl. (dkt. #54-12).)  It also noted that Guild had eliminated existing committees and "deviat[ed] from long-standing financial practices." (*Id*.)

That same month, Mayor Frederickson brought in two investigators with the Madison law firm of von Briesen & Roper to look into the claims made by Kingman and others in the Declaration.  (*Id*. ¶¶ 91-104.)  Although the investigators contacted Kingman to interview him regarding the Declaration less than a month after it was presented (*id*. ¶ 107), he refused to participate, purportedly because he did not trust that the investigators were duly authorized; this despite Mayor Frederickson notifying Kingman personally that the investigators had been selected by the city to look into the allegations of the Declaration. (*Id*. ¶¶ 108-109.)

On April 4, 2019, Kingman submitted a separate, internal complaint against Guild, which claimed that Guild had engaged in wrongful harassment and retaliation against him for his having filed the Declaration with the City Council.  (*Id*. ¶ 110.)  The next day, Kingman filed similar complaints with the Wisconsin Equal Rights Division ("ERD") and the U.S. Equal Employment Opportunity Commission ("EEOC"), alleging age discrimination and retaliation.  (*Id*. ¶ 111.)

### C. Complaints Against Kingman

On April 22, 2019, seven current employees with the Department of Public Works and one former employee, presented a complaint at the council meeting alleging a longstanding, toxic work environment within their department. (*Id.* ¶ 123.) While there is some indication that Guild provided complaint "templates" and met with the employees before they presented the complaint, there is *no* evidence that it did not represent the employees' true feelings nor that they were coerced into presenting it. (*Id.* ¶ 123); (Rettko Decl. (dkt. # 65-8) 58-60.)

The very next day, Kingman emailed the Department of Public Works Street Foreman Dan Hekrdle asking him to issue verbal warnings to the complaining employees, because their complaints should have been sent to Kingman as their direct supervisor, a fact which Kingman does not dispute. (Pl.'s Resp. to Def.'s PFOF (dkt. #70) ¶ 124.) Hekrdle's contemporaneous notes indicate that Kingman then called four times over the next three days after the complaint, asking him to discipline the employees and look into terminating them.[3] (Frederickson Decl. (dkt. #54-18).) In fact, two days after the

---

[3] Kingman moved to strike consideration of Hekrdle's notes on the grounds that they were not relied upon as a basis for the city's termination of his employment. (Pl.'s Resp. to Def.'s PFOF (dkt. #70) ¶ 125.) However, there are three problems with this argument. First, the question of whether it was in fact relied upon in whole or in part remains a question for the trier of fact should Kingman's case go forward to trial. Second, even if notes of Kingman's statements to Hekrdle were not directly admissible as past recollection of a party opponent's statements, those statements would appear relevant as to his state of mind, purpose and knowledge. Third, Kingman asks for the court to strike exhibits several times, but repeatedly buries his motions in his responses to individual proposed findings of fact with little, if any, reason provided. For instance, one response to a proposed fact simply reads, "Admit, but move to strike Ex. 1 to Macy Affadavit." (Pl.'s Resp. to Def.'s PFOF (dkt. #70) ¶ 135.) Kingman cannot simply sprinkle motions to strike in responses to proposed findings with zero explanation and expect that the court will credit the motion. Given that there are so many of these small, unexplained motions contained in the proposed findings,

complaint, those notes reflect Hekrdle met with Kingman for three hours, who continuously attempted to convince Hekrdle to discipline or terminate the employees. (*Id*.) Hekrdle finally left the meeting, telling Kingman that no discipline was necessary and that "this seems to be a personal issue between you and many employees." (*Id*. at 2.)

In May 2019, several other city employees also presented their own "Declaration of Full Confidence in Daniel Guild" to the council. (Pl.'s Resp. to Def.'s PFOF (dkt. #70) ¶ 90.) Mayor Frederickson next assigned the von Brieson investigators to look into the "toxic workplace" complaints by employees of the Department of Public Works as part of their existing investigation, and Kingman was finally interviewed by investigators on May 22, 2019. (Pl.'s Resp. to Def.'s PFOF (dkt. #70) ¶¶ 132-134.)

D. Kingman's Termination

Investigators presented a verbal summary of their investigation to the council in closed session on June 10, 2019, as well as provided copies of their written report, but made no recommendation as to whether action should be taken regarding Guild or Kingman. (*Id*. ¶¶ 135, 151.) Neither Guild nor Kingman were present at this closed session. (*Id*. ¶ 138.) The council took no action that day but concluded that there was sufficient evidence to consider whether to take action on Kingman's employment at a later meeting. (Pl.'s Resp. to Def.'s PFOF (dkt. #70) ¶ 140.) Another closed session was scheduled for June 24, 2019, and Kingman and his counsel were notified of that session and his right to make himself available for questioning. (*Id*. ¶ 142.)

---

which appear on their face to have little or no merit, all of plaintiff's *pro forma* motions to strike will be denied.

7

DPW Street Foreman Hekrdle spoke at the June 24 meeting, explaining how, in his view, Kingman had pressured him to discipline or terminate the employees who complained about Kingman. (*Id*. ¶ 144.) After Kingman also spoke, he was excused from the meeting and the council discussed Kingman's employment. (*Id*. ¶ 147.)

Once they returned to open session, the council voted 4-4 to discharge Kingman, with Mayor Frederickson breaking the tie in favor of termination. (*Id*. ¶¶ 148-150.) Mayor Frederickson wrote a letter to Kingman the next day, confirming his discharge, stating that the council based their decision on Kingman's threats of retaliation and directives to improperly discipline employees, advising that "a majority of the Council did not find your explanation at the private conference to be convincing." (Frederickson Decl. (dkt. # 54-25).)

## OPINION

Summary judgment must be granted against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If there is any genuine issue as to any material fact, the court cannot grant summary judgment. *Id*. A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citation omitted). Finally, "[t]he evidence of the non-movant[s] is to be believed, and all justifiable inferences are to be drawn in [their] favor." *Id*. at 255.

Applying these general standards, the court will examine whether plaintiff Kingman has met his burden of production as to his claims for First Amendment retaliation and age discrimination.

## I.  First Amendment Retaliation

In order to prove First Amendment retaliation in an employment context, the plaintiff must prove the following four elements:

> First, the plaintiffs must prove that their speech was a matter of public concern. Next, they must prove that their speech played at least a substantial role in the employer's decision to take an adverse employment action against them. If the plaintiffs can carry their burden on these two elements, the defendants can only prevail if they prove by a preponderance of the evidence that the government's interest, as an employer, in efficiently providing government services outweighs the employees' First Amendment interests, or if they can prove that they would have disciplined the employees even in the absence of the speech.

*Gustafson v. Jones*, 290 F.3d 895, 906 (7th Cir. 2002).  On this record, plaintiff has at least failed to meet his burden of production with respect to both public concern and substantial role elements.  The court assesses each of these requirements below.

### A.  Public Concern

Plaintiff's first burden is showing that the speech for which he claims punishment was a matter of public concern.  "The 'public concern' element is satisfied if the speech can fairly be said to relate to a matter of political, social, or other concern to the community, rather than merely a personal grievance of interest only to the employee." *Gustafson*, 290

F.3d at 907. If the employee's speech is *not* a matter of public concern, it cannot be regarded as constitutionally protected. *Swearnigen-El v. Cook Cnty. Sheriff's Dep't*, 602 F.3d 852, 861-62 (7th Cir. 2010).

In deciding whether the speech was of public concern, courts must look to the content and context of the speech as a whole. *Gazarkiewicz v. Town of Kingsford Heights, Indiana*, 359 F.3d 933, 942-43 (7th Cir. 2004). "When employees make statements 'pursuant to their official duties,' they are not speaking 'as citizens' for First Amendment purposes." *Id*. (*quoting Garcetti v. Ceballos*, 547 U.S. 410, 421, (2006).) Regarding official duties, courts ask two questions: "(1) was the intended audience internal or external to the plaintiff's employment; and (2) how did the speech relate to the plaintiff's job duties?" *Nesvold v. Roland*, 37 F. Supp. 3d 1027, 1037 (W.D. Wis. 2014)

Looking at Kingman's statement as a whole, it is primarily focused on his interests as an employee, requiring a reasonable inference that it was meant for an internal audience. Indeed, his Declaration focuses on then-City Administrator's Guild's internal management style, his availability to City employees while in the office and by email, and his administrative choices. (Frederickson Decl. (dkt. #54-12) 1.) In Kingman's written remarks in support of the Declaration, he also laments the fact that Guild "has changed all stationary [and] constantly requires reporting in writing." (*Id*. at 2.) A broader public is not only unlikely to care about any of these matters, but the concerns themselves are plainly not intended for a public audience, nor could a reasonable trier of fact conclude otherwise.

There is only one statement in the text of the Declaration or Kingman's supporting

10

remarks that could *even arguably* be considered a matter of public concern -- an accusation of Guild's "deviation from long-standing financial practices." (Frederickson Decl. (dkt. #54-12) 2.) This appears to be a reference to Guild's purchase of new office furniture for $13,261.88, which had apparently been reported on in the local news. (Rettko Decl. (dkt. #66-24) 1.) The Declaration does not, however, go into any more detail about the allegations than the seven-word statement quoted above.

While newsworthiness or allegations made at a public city council meeting could support Kingman's assertions that the subject of his Declaration was of public concern, that is not necessarily true. For instance, in a case involving a police officer speaking up at a city council meeting regarding a criminal investigation, the fact that the news had already reported on the matter cut against the plaintiff. *See Cooper v. City of Black River Falls*, No. 18-CV-288-WMC, 2019 WL 4540928, at *14 (W.D. Wis. Sept. 19, 2019), *appeal dismissed*, No. 19-3053, 2020 WL 1888305 (7th Cir. Apr. 15, 2020) ("As plaintiff points out, the criminal investigation was no longer confidential, having both been reported in local newspapers and the subject of an earlier city council meeting, but *this actually cuts against plaintiff*, having *already* been made a matter of public concern.") (emphasis added).

In *Cooper*, this court found that previous news articles "defanged" plaintiff's assertion that he was bringing up an important topic for the public's consideration, as it was already part of the public consciousness. *Id*. Similarly, news articles about Guild's administrative skills or spending at most lend some support to Kingman's assertion that the Declaration was of public concern. Moreover, in Kingman's outline for his comments to the council, which were not part of his signed declaration or attached written remarks,

11

he also mentions the increase in open records requests against the city, negative news headlines, and political strife, which arguably also could address matters of public concern. (*Id*. at 2.) While a speech containing even one point of public interest, among many, may be of public concern, *Connick v. Myers*, 461 U.S. 138, 149 (1983), Kingman fails to identify any of these alleged, political problems, whether in his speech to the council, in the text of the Declaration or in attached supporting remarks. It would be a stretch for a reasonable jury to infer that Kingman's comments were intended for the public, especially since his allegations against Guild were so broad that it would be hard for the public to even identify the specific content.

Even more problematic for plaintiff, the Declaration and Kingman's support commentary leads to the conclusion that he and his co-signers were speaking as part of their job duties, at least in light of Seventh Circuit precedent that, "it is clear that the complaints . . . made directly up the chain of command to his supervisors are not protected by the First Amendment." *Bivens v. Trent*, 591 F.3d 555, 560 (7th Cir. 2010). Indeed, there is no dispute that Guild was Kingsman's direct supervisor, and Guild reported directly to the Mayor and City Council. (Def.'s PFOF (dkt. # 53) ¶¶ 70-71.) The fact that Kingsman, in complaining about his supervisor Guild, went to the council is evidence that he was reporting problems *within* the chain of command. Text from the Declaration itself suggests as much, stating, "As employees and representatives of the City, we care about Rhinelander very much . . . We ask that the Rhinelander City Council consider this declaration and take appropriate action against Daniel Guild to protect the City of Rhinelander and us as employees and representatives of the City of Rhinelander."

12

(Frederickson Decl. (dkt. #54-12) 1.)  This statement quite clearly demonstrates that the signatories of the Declaration were signing "as employees and representatives of the City." (*Id*.)   Further, while Kingman now avers that he spoke during the section of the City Council meeting set aside for citizen comments as a citizen, there it is also *no* dispute that Kingman's presence at those meetings was part of his express *job duties*.  (Pl.'s Resp. to Def.'s PFOF (dkt. # 70) ¶ 7.)

      Given the fact that Kingman (1) was required to be at council meetings for his job, (2) signed the declaration "as an employee," and (3) was reading a report critical of his direct supervisor Guild, to Guild's supervisors, a reasonable trier of fact would be compelled to find that Kingman was speaking within the context of his official duties, and that any attempt to construe Kingman's Declaration or remarks so broadly to find that it even touched on matters of public concern, would be wholly unwarranted in light of its content and context.  For that reason, the court finds as a matter of law that Kingman's Declaration was *not* a matter of public concern and, thus, was not protected speech.

    **B. Substantial Factor**

      Even if the Declaration had concerned a matter of broader public concern, however, Kingman also fails to show on this record that it or Kingman's related comments played a substantial role in his termination.  This second element of first amendment retaliation -- whether the contested speech was a substantial factor in defendant's negative employment action against plaintiff -- involves shifting burdens.  To begin, "a motivating factor does not amount to a but-for factor or to the only factor, but is rather a factor that motivated the defendant's actions."  *Mullin v. Gettinger*, 450 F.3d 280, 284 (7th Cir. 2006) (*quoting*

13

*Spiegla v. Hull*, 371 F.3d 928, 942 (7th Cir. 2004). However, this is a fairly low burden that can be proven by "[c]ircumstantial proof, such as the timing of events or the disparate treatment of similar individuals." *Massey v. Johnson*, 457 F.3d 711, 717 (7th Cir. 2006). If proven, "the burden then shifts to the defendants to produce evidence that they would have fired the plaintiffs even in absence of their [speech] . . . Finally, assuming the defendants carry that burden, the plaintiffs then must persuade a fact-finder that the defendants' proffered reasons were pretextual and that retaliatory animus was the real reason that the defendants fired them." *Id*. (internal citations omitted.)

Only after plaintiff has shown that the offered reason for firing was pretextual are the last two factors for retaliation addressed: "Although the persuasiveness of an employer's non-retaliatory explanation ordinarily is 'for the finder of fact to assess,' summary judgment should be granted when, in light of the defendant's unrebutted evidence, 'the court can say without reservation that a reasonable finder of fact would be compelled to credit the employer's case on this point.'" *Massey*, 457 F.3d at 719 (*quoting Venters v. City of Delphi*, 123 F.3d 956, 973 (7th Cir.1997).) This is just such a case.

Because the burden for showing that speech was a motivating factor in firing is so low, the court finds that Kingman has borne his burden for purposes of summary judgment. Specifically, Kingman points out that he was fired only a few months after speaking out against City Administrator Guild. (Pl.'s Resp. to Def.'s PFOF (dkt. #70) ¶¶ 148-150.) While this timing component is not enough to show but-for causation, it is sufficient to infer that Kingman's Declaration was at very least a factor in the decision to fire him. The question is whether defendants would have fired Kingman even in the absence of his

14

speech. Here, the record provides myriad grounds for Kingman's firing unrelated to his public statements about his immediate supervisor. Even before he spoke out, Kingman was under a Performance Improvement Plan, had been officially reprimanded, and had several complaints against him by members of his staff. (Pl.'s Resp. to Def.'s PFOF (dkt. #70) ¶ 27, 29-31.) While Kingman's firing occurred after his speech to the city council, it was temporally even closer to when Kingman called for employees who spoke against him to be disciplined or fired. This pattern of employee complaints, reported poor workplace behavior, and even retaliatory conduct compel finding that the city would have fired Kingman regardless of his Declaration or related comments at the council meeting.

Regardless, Kingman must show that the city's reasons for firing him were pretextual, and plaintiff fails to meet this burden. Kingman again merely argues that because his firing fell within a few months after his public statements, a jury could reasonably find that it was his speech that caused his firing, not his intervening workplace misbehavior. (Pl.'s Opp. (dkt. # 69) 44.) Without proof, Kingman also argues a broad plot had been hatched against him by members of the Rhinelander local government, including suspicious investigations and machinations by Guild, all to create a pretextual reason to fire Kingman. (*Id*.) However, none of this is supported by the evidence at summary judgment. Thus, the court can say without reservation that a reasonable trier of fact would be compelled to credit defendants' reasons for firing Kingman, and certainly that there is no basis to find any of those reasons were pretextual.

As the Seventh Circuit has noted, summary judgment "is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a

15

trier of fact to accept its version of events." *Schacht v. Wisconsin Dep't of Corr.*, 175 F.3d 497, 504 (7th Cir. 1999). Vague allegations of shady plots by Guild do not sufficiently create a genuine issue of material fact. Indeed, there is *no* evidence that Guild influenced the council's termination decision. While there is some evidence that Guild privately supported employees within the Department of Public Works who spoke against Kingman, plaintiff has provided no evidence that the employees were lying about their experiences or opinions of Kingman, nor that any council members were complicit in this effort. (Pl.'s PFOF (dkt. # 68) ¶ 127.) Kingman also ignores that Guild was not even present at the city council meeting at which Kingman was terminated, nor that Guild had no hiring or firing power over Kingman. "To constitute direct evidence of improper animus, a statement must relate to the motivation of the decision maker responsible for the contested decision, or to the motivation of those who provide input in the decision." *Massey*, 457 F.3d at 718 (*citing Ezell v. Potter*, 400 F.3d 1041, 1051 (7th Cir.2005)). Thus, even if Guild had been acting improperly -- and there is no evidence from which a reasonable jury could make this inference -- Guild did not make the decision to fire Kingman and had no authority over the council members who did make the decision, as Guild, too, reported to the council.

Kingman also vaguely suggests that the investigation against him was improper, because "the persons chosen to do the investigation were within the confidence of Guild and the 'majority'." (Pl.'s Resp. (dkt. 69) ¶ 36.) However, at his deposition, Kingman himself acknowledged, "I have not alleged [the investigators] acted unethically." (Def.'s Rep. (dkt. # 96) 17.) Indeed, Kingman has provided no evidence that there was any

16

impropriety in the independent investigation conducted at the city council's direction.

Finally, Kingman makes a great deal of the fact that the council members who voted against terminating him did not *recall* any documentation being provided at the closed council session. However, plaintiff did not, and could not, dispute that a full investigation was conducted by an outside law firm regarding Guild *and* Kingman, the results of which were presented to the council, including the existence of complaints against Kingman and a Performance Improvement Plan dating back to the previous mayor's administration. In fact, plaintiff admitted the existence of many, documented workplace events that could reasonably lead to his termination, including: (1) numerous reports spanning years alleging that Kingman created a hostile work environment; (2) an active Performance Improvement Plan; (3) official discipline from the *former* city administrator in charge of Kingman's Performance Improvement Plan due to Kingman directly insulting her; (4) other employee complaints; (5) a full report from the outside investigators into Kingman's conduct; (6) documented and persistent retaliatory efforts to discipline employees who spoke out against him; and (7) live testimony in front of the council regarding Kingman's retaliatory actions. While Kingman disputes the relative merits of some of his misconduct, he does not dispute that each occurred, nor that they had been contemporaneously noted during his tenure with the city.

Any one or two of these factors could suffice to terminate an employee; when combined together over a period of years and different city administrations, no reasonable trier of fact could find that it was, in fact, his short statement against the current city administrator Daniel Guild months before his termination that led to his firing, rather than

17

the long list of his previous employment actions before and after his statement. As the Seventh Circuit held in *Massey*, the plaintiff "simply has not come forward with evidence that the defendants were lying when they cited [misbehavior] as the reasons for h[is] termination." 457 F.3d at 719. Without proving that his speech played a substantial role in his termination, even if protected, summary judgment must be entered for the defendants.

## II. ADEA Claim

As for plaintiff's ADEA claim against the defendants, Kingman claims that he was retaliated against for filing a complaint with the ERD and EEOC. As a preliminary matter, Kingman's support for his original age discrimination complaint is that "each defendant named in this case is at least 10 years younger than he is, and . . . newly elected public officials were talking about a new direction which he wasn't a part of, as they referred to him and other Alderpersons as the 'old' group." (Pl.'s Resp. (dkt. 69) 51.) Plaintiff provides no other support for his underlying ADEA claim; instead, he pivots to arguing that he was retaliated against for filing an age discrimination claim.

As plaintiff himself acknowledges, however, "a plaintiff must present evidence of: (1) a statutorily protected activity; (2) an adverse action; and (3) a causal connection between the two." *Burks v. Wisconsin Dep't of Transp.*, 464 F.3d 744, 758 (7th Cir. 2006). Here, the *only* evidence plaintiff provided is that the council knew Kingman filed an age discrimination complaint before his termination. (Pl.'s Resp. (dkt. 69) 52.) Absent "any direct evidence of a causal link between her complaints of discrimination" and the adverse employment action, this is simply insufficient. *Burks v. Wisconsin Dep't of Transp.*, 464 F.3d

744, 758 (7th Cir. 2006). As already explained, there is overwhelming evidence to support the council's decision to fire Kingman, even taking into account his Declaration and comments to the council. Plaintiff's perfunctory ADEA claim is similarly insufficient to prove retaliation in light of this record. Given plaintiff's failure to link his ADEA complaint to his termination, summary judgment is warranted on that claim as well.

## ORDER

IT IS ORDERED that:

1) Plaintiff's unsupported, *pro forma* explicit and implicit "motions to strike" specific portions of defendants' Proposed Findings of Fact sprinkled thought its' response to those PFOFs (dkt. #70) are DENIED.

2) Defendants Chris Frederickson, Andrew Larson, David Holt, Steve Sauer, Ryan Rossing, Daniel Guild, and the City of Rhinelander's motion for summary judgment (dkt. #51) is GRANTED.

Entered this 13th day of December, 2021.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge